ORIGINAL

FILED
JAN 3 2005
U.S. COURT OF
FEDERAL CLAIMS

ECF

# UNITED STATES COURT OF FEDERAL CLAIMS

************************************

**LaBarge, Inc.,**

**Plaintiff,**

**v.**

**The United States,**

**Defendant.**

************************************

**No.** 05- 1C

**Judge** ____________________

## COMPLAINT

**Comes now** plaintiff LaBarge, Inc. and for its Complaint against the United States states as follows:

Parties

1. Plaintiff LaBarge, Inc. is a Delaware corporation, presently active and in good standing, with its principal place of business in the County of St. Louis, Missouri.

2. The United States is a proper party herein by virtue of the actions of its Congressional agency, the Library of Congress [herein "Library" or "LoC"].

Jurisdiction

3. Jurisdiction lies in this Court by virtue of 28 U.S.C. §§1491 & 1503.

The Contract

4. Contract H70015 was awarded by the Procurement and Supply Division, Library of Congress, to LaBarge on or about February 17, 1987. The contract was a reprocurement, LoC's prior contractor Phi Technologies, Inc. having failed. As amended, the contract called for LaBarge to design certain modifications to a prior version of LoC's "talking book" audio tape playback machine and to manufacture 11,290 copies. The version manufactured by LaBarge to meet LoC's specifications was known as the "C-2", in contrast to LoC's prior version, known as the "C-1". Total value of the design and

manufacture portion of the contract was approximately $2.6 million. A copy of the contract is attached hereto as Exhibit 1. A copy of LoC's contract specifications, as amended, is attached hereto as Exhibit 2.

5. The Library's talking books are standard 4-track audio-tape cassettes recorded to play at half commercial speed. The C-1 machine is a playback device designed to operate either on standard 120 volt A.C. line voltage or in a D.C. battery mode. The C-1 contains an integral battery-charge feature, however, the machine will not recharge the battery while it is operating in playback mode. The C-1 and C-2 machines are housed in the same plastic case, however, the Library's specifications called for the C-2 to have the capacity to recharge its internal battery while it was being operated in playback mode, among other things. The playback machines and talking books are distributed by the Library as part of its program for the benefit of blind and physically-handicapped readers.

6. The contract required that LaBarge's C-2 design meet LoC's rigorous testing, inspection, and approval requirements and be tested, approved, and listed by Underwriters Laboratories prior to release for production. Although LaBarge commenced work on the C-2 contract in 1987, LoC required that LaBarge make numerous changes to its design, and LoC did not approve LaBarge's C-2 machine for production until late in 1992.

7. LaBarge commenced production of C-2 units late in 1992 and completed deliveries of all 11,290 units early in September 1996. LaBarge was paid by the Library at the contract rate for all units delivered.

8. As part of its contractual obligations, LaBarge was required to provide in-warranty service for units returned for malfunctions for a period of five years after shipment of the last unit. LaBarge was obligated to absorb the cost of repairs resulting from defects, as well as normal wear, but LoC agreed to pay LaBarge for repairs required by customer abuse and missing parts. To accomplish these requirements, LaBarge established a repair depot at its Huntsville, AR manufacturing facility, where it routinely repaired and returned to service hundreds of playback machines over a period in excess of five years. LaBarge's repair activities were subject to periodic inspections by LoC personnel.

## The Disputes

9. During an inspection visit to LaBarge in October 1999, a LoC inspector isolated two C-2 units among several hundred repair returns and directed LaBarge to ship them to LoC in Washington. These two units had small holes melted in the bottom of the the plastic case adjacent to the battery recharging transformer. LoC subjected one of these units to testing by an outside laboratory, which issued a report on July 6, 2000 concluding that under certain abnormal conditions, C-2 units could pose a shock and fire hazard.

10. Subsequently, in July 2000, LoC issued a notice recalling all C-2 units from the field. No prior notice of the recall was given to LaBarge, and LaBarge was neither asked, nor given the opportunity to take any action prior to the recall.

11. By letter to LaBarge dated May 14, 2001, LoC asserted that the C-2 machines contained a latent defect that existed at acceptance, but which could not have been discovered by reasonable inspection. Based upon this assertion, LoC demanded that LaBarge either show cause why the contract should not be terminated for default, or propose a cost adjustment or replacement of all recalled C-2 machines.

12. LaBarge timely responded to LoC's show-cause demand by undertaking to commence a technical investigation. To facilitate its investigation, LaBarge asked for copies of the reports of LoC's testing consultants and access to the two failed units for examination. LoC provided LaBarge with copies of the reports, but has never allowed LaBarge access to the failed units, several requests notwithstanding.

13. During the latter half of 2001, LaBarge nevertheless conducted a technical investigation, but was unable to replicate the case melt-through described by LoC using any reasonable set of test conditions. LaBarge provided a summary report of its investigation to LoC in May 2002 and asked for assistance.

14. By letter of September 3, 2002, LoC responded that its engineering staff had conducted experiments involving installing a different part in the C-2 machines under test such that the motor was jammed. The test units were then packed in styrofoam insulation in one case and between two bedding pillows in a second case. The machines were then plugged in and heat allowed to accumulate for approximately eight hours. In both cases, according to LoC, the experiment resulted in case melt through. In a third experiment, a similarly modified machine was insulated by a single pillow on the bottom

side and left to accumulate heat for 16 hours, which, according to LoC, resulted in case melt through. Based upon these experiments, LoC again concluded that the C-2 machines pose a shock and fire hazard, and it reasserted that the machines are defective.

15. Later in September 2002, LaBarge asked LoC whether or not it was the Library's position that the test conditions and performance criteria reported in its September 3 letter were contractually mandated. The Library responded in May 2003 with the conclusion that the C-2 machines' inability to survive LoC's test conditions rendered them latently defective and LaBarge liable.

16. In August 2003, LaBarge issued a full response to LoC's show-cause demand, asserting among other things:

a. The two consulting reports relied upon by LoC reach unsupportable and erroneous conclusions.

b. The conclusions reached by LoC's engineering staff are based upon conditions far in excess of any operating environment envisioned by the contract specifications.

c. The C-2 units are capable of generating more heat than the C-1 units as a necessary result of LoC's contract requirement that the C-2 have the capacity to charge the internal battery while operating in playback mode. No reasonably foreseeable malfunction or mishandling of the C-2 units will result in either a shock or fire hazard. The C-2 units found with holes melted in the case were most likely subjected to a significant external heat source, such as operation under excessive load while sitting on a residential radiator.

d. The Library's asserted entitlement to revoke its acceptance is unwarranted because as measured by contract specifications, the C-2 units are not defective; the units meet all contract requirements, including UL listing. If the machines constitute a hazard, the legal responsibility therefor is LoC's under the government's implied warranty of the sufficiency of its own design specifications.

e. Even if the C-2 units were legally defective, the defect is not latent; LoC and its engineering staff were fully aware of the heat dissipation capacities of the design approved by LoC.

f. The Library cannot prove a causal connection between the defect it alleged and product failure, nor can it prove that the hazard alleged was not caused by post-acceptance events.

g. Upon discovery of the alleged latent defect, LoC failed to give timely notice to LaBarge and to act within a reasonable time. Under applicable government contract case law, LoC's latent defect claim is barred.

h. Given the age and obsolescence of the C-2 machines and the *de minimis* incidence of failure, LoC can prove no damages.

17. In June 2000, LaBarge submitted to LoC a claim for costs incurred in making nonwarranty repairs to certain C-2 machines and scrapping others. The claim requested a contract increase of $21,428.84.

18. On instructions from LoC, LaBarge has since 1999 held approximately 800 C-2 machines in storage for LoC's disposition. In July 2004, LaBarge submitted to LoC a claim for storage costs incurred to date, in the amount of $16,200.

Disputes Resolution

19. The contract between LoC and LaBarge includes a disputes clause containing the terms of old Defense Acquisition Regulation 52.233-1, which incorporates the terms of the Contract Disputes Act of 1978 ["CDA"]. Exhibit 1 at I-20.

## COUNT I

20. LaBarge incorporates the allegations of ¶¶4 - 19 herein.

21. By letter of September 14, 2004, LoC's contracting officer issued a final decision denying LaBarge's $16,200 storage cost claim on the ground that LaBarge supplied C-2 machines containing a latent defect and that LaBarge is therefore responsible for storing unuseable machines. A copy of the September 14, 2004 final decision is attached hereto as Exhibit 3. The final decision also gave notice that LaBarge may bring an action appealing the agency action in this Court within 12 months.

23. The contracting officer's final decision is erroneous in fact and in law.

24. The Library's actions constituted a change under the Changes clause of the contract, for which LaBarge is entitled to an equitable adjustment in the amount of $16,200, plus interest under the terms of the Disputes Clause and the CDA, as incorporated into the contract by reference.

WHEREFORE, LaBarge prays that the Court enter judgment for plaintiff for $16,200, interest thereon, and its costs.

## COUNT II

25. LaBarge incorporates the allegations of ¶¶4 - 19 herein.

26. By letter of September 14, 2004, Exhibit 3, LoC's contracting officer issued a final decision denying LaBarge's $21,424.84 claim for nonwarranty repairs. Although the decision conceded that the claim was otherwise payable, the basis for denial was stated to be setoff against LoC's claim against LaBarge on account of alleged latent defect in the C-2 machines delivered. The final decision also gave notice that LaBarge may bring an action appealing the agency action in this Court within 12 months.

27. The contracting officer's final decision is erroneous in fact and in law.

28. The Library's actions constituted a change under the Changes clause of the contract, for which LaBarge is entitled to an equitable adjustment in the amount of $21,424.84, plus interest under the terms of the Disputes Clause and the CDA, as incorporated into the contract by reference.

WHEREFORE, LaBarge prays that the Court enter judgment for plaintiff for $21,424.84, interest thereon, and its costs.

## COUNT III

29. LaBarge incorporates the allegations of ¶¶4 - 19 herein.

30. By letter dated March 19, 2004, LoC's contracting officer rejected the positions stated by LaBarge in its August 2003 show-cause response and issued a final decision that LaBarge is bound to pay the Library $1,807,993. The final decision also gave notice that LaBarge may bring an action appealing the agency action in this Court within 12 months. A copy of the March 19, 2004 final decision is attached hereto as Exhibit 4.

29. The contracting officer's final decision is erroneous in fact and in law. The Library has no legal basis upon which to seek payment of $1,807,993 from LaBarge.

WHEREFORE, LaBarge prays that the Court enter judgment for plaintiff that defendant take nothing on its claims and for plaintiff's costs.

Respectfully submitted,

12/29/04

Gary T. Carr
Post Office Box 300129
6253 Westminster Pl.
St. Louis, MO 63130
(314) 725-6464
Fax: (314) 725-6868

Attorney of Record for Plaintiff

Of Counsel:

Stephen S. Kaye
Bryan Cave LLP
700 Thirteenth Street N.W.
Washington, D.C. 20005-3960
(202) 508-6000
Fax: (202) 508-6200

Of Counsel

Attorneys for Plaintiff