# United States Court of Federal Claims

| | | |
|---|---|---|
| **LaBarge, Inc.,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 05-1C** |
| **The United States,** | ) | **Senior Judge Smith** |
| **Defendant.** | ) | |

## JOINT PRELIMINARY STATUS REPORT[1]

Pursuant to Section III, Appendix A, of the Rules of the United States Court of Federal Claims ("RCFC"), the parties respectfully report as follows:

a. Jurisdiction: Plaintiff, LaBarge, Inc. ("LaBarge"), believes that the Court possesses jurisdiction to entertain its lawsuit. Defendant, the United States, has identified no reason to question the Court's jurisdiction at this time.

b. Consolidation: The parties believe that this case need not be consolidated with any other case.

c. Bifurcation: At present, the parties believe that bifurcation is unnecessary. The parties recognize that, depending upon the liability issues that present themselves for trial, bifurcation may become appropriate at a later time.

[1] As instructed by Local Rule, counsel have met, conferred, and agreed upon the content of this Report, except for their respective statements of Relevant Factual and Legal Issues, Section h. Counsel had insufficient time to consolidate their submissions, and therefore are filing separate documents. Except for Section h, the content of both submissions should be the same.]

d. Deferral: The parties do not believe that further proceedings in this action should be deferred pending consideration of another case before this Court, or any other tribunal.

e. Remand/Suspension: The parties do not intend to request a remand or a suspension in this case.

f. Additional Parties: The parties do not anticipate joining any additional parties to this lawsuit.

g. Dispositive Motions: LaBarge intends to file a dispositive motion pursuant to RCFC 56 at the close of discovery. At present, the Government is not in a position to determine whether it will file a dispositive motion, but will consider such a motion after discovery, if the evidence warrants.

h. Relevant Factual and Legal Issues - LaBarge's Statement:

1. Background Facts:

The machines that are the subject matter of this case are audiocassette tape playback devices known as the "C-2". During the past 75 years, LoC has procured "talking books" using several different formats, including records and tapes. After a development period in the 1970's, LoC settled on the design of the standard audiocassette machine known as the "C-1", which has been produced in large quantities since 1981.

The C-1 will play audio tapes of books using either standard house current or its own internal rechargeable battery. The battery is recharged by plugging the unit into house current. The C-1 does not have sufficient power, however, to recharge the battery while the unit is being used to play tapes.

Subsequent to the introduction of the C-1, LoC began developing specifications for a more powerful unit, the C-2, which, among other things, would have power sufficient to recharge the internal battery while the unit was in use. Sometime prior to 1987, LoC in fact entered a contract with Phi Technologies for the development and manufacture of C-2 units. Although Phi produced a prototype C-2 unit, the contract

failed, and the work was reawarded to LaBarge in the spring of 1987 under the contract at bar. The initial value of the contract was approximately $2.6 million.

Although LaBarge commenced work in 1987, and worked steadily with LoC's technical staff on the development, the design of the production units and first manufactured articles were not approved by LoC for production until the fall of 1992. Underwriters Laboratories approved LaBarge's C-2 units for UL listing late in 1991. Production and shipments to users commenced in 1992, and LaBarge completed the manufacture and delivery of the approximately 11,000 units under contract in September 1996.

In October 1999, during a visit to LaBarge, a LoC inspector isolated two C-2 units among several hundred that had been returned to LaBarge for routine service and directed that they be sent to LoC. These two units had small holes melted in the bottom of the plastic case. LoC sent one of the units to an outside consultant, which issued a July 6, 2000 report concluding that "there is undoubtedly a fire and shock hazard which could occur in additional units of the same construction should an internal abnormal condition arise."

On July 10, 2000, LoC gave LaBarge notice that it was recalling all C-2 units in circulation. On May 14, 2001, LoC issued a letter to LaBarge, which purported to revoke LoC's acceptance of all 11,000 C-2 units and instruct LaBarge to show cause why its contract should not be terminated for default. The letter demanded further that LaBarge either replace all C-2's with C-1's, or refund the entire contract amount.

LaBarge undertook its own technical investigation, which concluded that the thermal damage to the two units was the result of customer abuse and that the C-2's as manufactured posed no risk of fire or shock beyond that ordinarily contemplated by users of such devices. Further, LaBarge asserted that the C-2's were contract compliant and that under the circumstances LoC was not entitled to revoke its acceptance of units that had been in service for more than four years.

LaBarge subsequently issued claims against LoC for certain unpaid repair costs and for costs of storage of C-2 units.

During 2004, LoC's contracting officer issued three final decisions denying LaBarge's claims for repair and storage costs and holding that LaBarge is bound to pay to LoC $1.8 million in restitution because the C-2 units as manufactured pose a safety hazard to users. This appeal resulted.

2. <u>Factual issues</u>:

i. What is the condition of the C-2 units 3864 and 11314?

ii. What caused the holes in the bottoms of C-2 units 3864 and 11314?

iii. Whether the failure of either unit 3864 or 11314 was accompanied by a risk of shock to a user.

iv. Whether the failure of either unit 3864 or 11314 was accompanied by a risk of fire.

v. Whether external heat sources were "but-for" causes of the holes melted in the bottoms of the two C2 units cited by LoC, serial numbers 3864 and 11314.

vi. Whether any C-2 unit in fact shocked a user or started a fire.

vii. Whether the design of the C-2 posed a risk of fire or shock.

viii. Whether any users of C-2's complained to LoC regarding heat-related problems, including fire and shock hazards.

ix. Whether, and the extent to which, LoC required material changes in LaBarge's C2 design.

x. Whether, and the extent to which, LaBarge's design of the C2 was controlled by LoC.

xi. Whether LoC's engineering staff was, or had reason to be, aware of those certain physical characteristics of the C2, which LoC now alleges as design defects, prior to its approval of LaBarge's design.

xii. What were LoC's reasons for recalling all C2's in circulation before giving notice to LaBarge?

xii. Assuming the C-2 units which suffered case melt-through were defective, was the fault the result of the failure of a specific component, or was the fault the result of the design, which therefore potentially infected all units?

xiv. Whether within the constraints imposed by LoC, alternative designs existed that would have materially reduced the risks of shock and/or fire.

xv. Whether or not LoC ever considered placing oral warnings regarding machine overheating in its instructional tapes or at the beginning of its talking book tapes.

xvi.What was the average life expectancy of the C2 machines in circulation at the time of recall?

xvii. Whether or not repairs or modifications to the C-2's necessary to alleviate safety risks are economically feasible.

xviii. What is the fair market value of the C-2's currently in storage?

3. Legal Issues:

i. Measured by contract requirements, were the C-2 machines defective at time of delivery?

ii. If the C-2 machines contained a defect, are all defective or only the two known to have failed with thermal damage?

iii. If the C-2 machines contained a design defect, was the defect latent or patent?

iv. Was LoC sufficiently aware of heat dissipation issues with the C-2 design before acceptance that any defect predicated on lack of heat dissipation is patent?

v. Whether LoC's elaborate and tightly-controlled system for review and approval of LaBarge's prototypes requires that it be held to the standard appropriate to a design specification, with resulting implied warranty.

vi. Can LoC sustain its burden of proving a causal connection between the alleged heat dissipation defects in the C-2 design and either product failure or injury to users?

vii. Can LoC sustain its burden of proving that the thermal failures of units 3864 and 11314 was not caused by events after acceptance?

viii. Is LoC barred by the passage of time between its learning of the alleged C-2 defect and its action to revoke its acceptance of deliveries?

ix. Is LoC's claim barred by limitations?

x. Whether the proper measure of damages is the "new-for-old" rule under which LoC's damages would be limited to either the actual, reasonable cost of repairs or the present value of machines still in existence, less normal wear and tear, obsolescence, and depreciation.

i. Settlement/ADR: The parties have discussed settlement, and intend to continue informal discussions as the litigation proceeds. At this time, however, the parties cannot state whether settlement is likely, or whether ADR is appropriate.

j. Trial Status: At present, if the case cannot be resolved by dispositive motions or settlement, the parties intend to proceed to trial. Neither party requests expedited trial scheduling.

k. Electronic Case Management: At this time, the parties are aware of no special issues regarding electronic case management needs.

l. Additional Information: LaBarge contends that it is entitled to trial de novo by this Court. The Government is aware of no reason to contest this assertion at this time. The parties are aware of no other information of which the Court should be aware at this time.

Proposed Discovery Plan

The parties propose the following discovery schedule:

| | |
|---|---|
| Initial Disclosures Pursuant to RCFC 26(a)(1) | September 6, 2005 |
| Designation of Experts and Submission of Reports | April 8, 2006 |
| Designation of Rebuttal Experts/Reports | July 8, 2006 |
| Close of all Discovery | September 6, 2006 |
| Dispositive Motions | November 6, 2006 |
| Pre-Trial Conference | January 17, 2007 |

Respectfully submitted,

/s/ Gary T. Carr
Post Office Box 300129
6253 Westminster Place
St. Louis, MO 63130
(314) 725-6464
Fax: 725-6868

Attorney for Plaintiff

Of Counsel
Stephen S. Kaye
700 Thirteenth Street N.W.
Washington, D.C. 20005-3960
(202) 508-6200

July 25, 2005

CERTIFICATE OF FILING

I hereby certify that on July 25, 2005, a copy of the foregoing "JOINT PRELIMINARY STATUS REPORT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Gary T. Carr